UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | |
| | ) | Crim. No. 15-10153-WGY |
| DAVID WRIGHT, | ) | |
| | ) | |
| Defendant. | ) | **FILED UNDER SEAL** |

**GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION
<u>FOR JUDGMENT OF ACQUITTAL</u>**

The United States hereby opposes the motion of David Wright ("defendant" or "Wright")

for a judgment of acquittal under Fed. R. Crim. P. 29 on all counts as the government has proven

all essential elements of the charged crimes beyond a reasonable doubt.

At the outset, the government notes that the defendant failed to specify on what grounds

they contend the evidence is insufficient on the obstruction counts (Counts 2-3 and 5).  Indeed,

the evidence on these counts was largely uncontested and clearly proved that (1) the defendant

instructed Usaamah Rahim to destroy his phone and reset his laptop computer to its original

factory settings to impede a federal investigation; (2) Rahim agreed with the defendant to wipe

all the data of his laptop computer; (3) the defendant caused Rahim to destroy data and alter the

contents of his laptop computer; and (4) the defendant destroyed data and altered the contents of

his own laptop computer with the intent to impede a federal investigation.

The defense challenges the sufficiency of the terrorism counts, Counts 1 and 4, on two

grounds.  First, with regards to Count One, conspiracy to provide material support to ISIS, a

foreign terrorist organization, in violation of 18 U.S.C. § 2339B, the defendant contends that the

government has failed to prove that he and his conspirators were acting in coordination with, or

at the direction of ISIS.  Second, with regards to Count 4, conspiracy to commit acts of terrorism

transcending national boundaries, the defendant claims that the government has failed to show that this conspiracy involved conduct overseas.  As explained below, the government has proven both of these elements.

## I.       Standard of Proof for Rule 29 Motion

In ruling on a Rule 29 motion, the court must "'examine the evidence, together with all inferences that may be drawn from it, in the light most favorable to the prosecution.'"  *United States v. Lopez-Diaz*, 794 F.3d 106, 110 (1st Cir. 2015) (*quoting United States v. Andujar*, 49 F.3d 16, 20 (1st Cir. 1995)).  In addition, the court must give "'equal weight to the direct and circumstantial evidence.'"  *United States v. Pena-Santo*, 809 F.3d 686, 696 (1st Cir. 2015) (*quoting United States v. Appolon*, 715 F.3d 362, 367 (1st Cir. 2013)).  Indeed, "circumstantial evidence alone may be sufficient to provide a basis for conviction."  *United States v. Rodriguez-Duran*, 507 F.3d 749, 758 (1st Cir. 2007).  Further, if evidentiary conflicts, credibility questions or competing inferences (two or more of which are plausible) arise, the trial judge must resolve them in the prosecution's favor.  *United States v. Olbres*, 61 F.3d 967, 970 (1st Cir. 1995).

## II.      Sufficient Evidence Exists that Defendant and his Conspirators Were Acting in Coordination with, or at Direction of, ISIS.

The defendant was charged with conspiring with Rahim, Nicholas Rovinski, and others to provide material support to ISIS in the form of services and personnel, in violation of 18 U.S.C. § 2339B.  The indictment makes clear that the services included the recruitment of "members for their 'martyrdom' operation."  *See* Second Superseding Ind. at ¶ 9.  The indictment also alleges that Wright, Rahim, and Rovinski conspired to kill persons inside the United States, consistent with ISIS's objectives.  *See id.* at ¶ 11.  The government proved that Wright conspired with Rahim and Rovinski to recruit more members to conduct attacks inside the United States, *see* for example Ex. 103 (discussing recruiting Sidiqi for their plans); Ex. 65 (On May 31, 2015, the

defendant sent a text message to Rovinski, which read: "No one should know of these plans unless they are proven trustworthy and have given bay'ah to the Khilafah."); 9/22/17 Tr. at 29 (Rovinski: Wright told Rovinski "we need more, quote 'lions' or people who are willing to fight for the Islamic State").

Additionally, the government proved that Wright, Rahim, and Rovinski conspired to kill persons in the United States in accordance with ISIS's instructions, including Al-Adnani's speech to commit attacks within the United States. Wright had copies of Al-Adnani's speeches on his laptop computer and thumb drive. *See* Ex. 310 (written excerpt of Al-Adnani's speech in ISIS book entitled, Lone Wolves); Exs. 246-247 (discs containing excerpt and entirety of Al-Adnani's speech entitled "Indeed Your Lord is Ever Watchful" advocating ISIS supporters to commit attacks in the United States). As Aaron Zelin testified, Al-Adnani's was ISIS spokesperson and his speech was widely distributed by ISIS to encourage its supporters to commit attacks in their homeland, resulting in an increase in ISIS attacks in the United States and in Europe. 9/28/17 Tr. at 175; 9/29/17 Tr. at 6. Nicholas Rovinski testified that the conspirators (Wright, Rovinski, and Rahim) pledged their support to the leader of ISIS, Abu Bakr al Baghdadi, and intended to kill Pamela Geller pursuant to ISIS's fatwa or order to kill her. 9/20/17 Tr. at 122-124 (Rovinski); 9/21/17 Tr. at 20-22, 32 (Rovinski); *see* Ex. 303 (In Dabiq Issue 9, which Wright viewed on May 22, 2015 according to internet activity records (Ex. 317), ISIS directs its supporters to follow the inspiration of the Garland attackers Elton Simpson and Nadir Soofi and commit attacks in "crusader lands," which refers to the United States). Indeed, the statements of Abu Hussain Al Britani, an ISIS member and co-conspirator, demonstrate that ISIS had instructed its followers to kill Pamela Geller, and Abu Hussain Al Britani had spoken to Rahim about beheading Ms. Geller. *See* Ex. 118 (Abu Hussain Al Britani tweets discussing

Garland attack and that two ISIS attackers had attempted to kill Geller and were killed during the attack.  As a result, those two ISIS attackers attained shahadah, an Arabic word meaning martyrdom); Ex. 119 (Abu Hussain Al Britani states on Twitter that he had spoken to Rahim and Rahim was going to behead Geller).

Wright further admitted to law enforcement during the June 2, 2015 interview that: (1) "he agreed with ISIS" and believed "they were justified in what they were doing" (9/22/17 Tr. at 124 (Chief James Bailey));  (2) he was aware of ISIS's fatwas issued by the ISIS spokesperson Abu Mohamad al-Adnani to carry out attacks in the United States and that these fatwas justified killing law enforcement in the United States (9/22/17 Tr. at 126); (3) he was aware of the ISIS fatwa to kill Pamela Geller and believed that "it was justified and she should be killed" (9/22/17 Tr. at 127); and (4) "he was in agreement with the fatwa and he indicated that Mr. Rahim had mentioned that he would be the one to carry out the fatwa to behead Ms. Geller and in the process become a Shaheed" (9/23/17 Tr. at 17).

In his communications, the defendant repeatedly indicated that he was aware of ISIS's statements and instructions and intended to follow them.  For instance, he told the FBI cooperator during a chat conversation on April 14, 2015, that his "desire was to obey the Khilafah [Islamic State] and fight against the Taghut [Devil] here."  *See* Ex. 51 & 51A and 9/26/17 Tr. at 44-63.  The defendant also described himself as one of ISIS's fighters in the United States who was awaiting his orders from ISIS.  (*see* Exs. 51 & 51A and 9/26/17 Tr. at 44-63: in chats with FBI cooperator, defendant stated on May 17, 2015, "2 Mujahids were martyred in Texas for attempting to kill everyone at the 'Draw Muhammad' cartoon contest held by the New Yorkian Jew, Pamela Geller, the Islamic State confirmed and approved of them and said that they have 71 more trained Mujahid fighters in 15 other states ready to act as soon as the

4

order is given[.]  I don't know who they are and they don't know about me for security reasons.").  Lastly, on the morning of June 2, 2015, Wright instructed Rahim to pursue martyrdom in coordination with ISIS's statements.  *See* Ex. 5 and 5A (call between defendant and Rahim wherein Rahim tells Wright he is going to go after the boys in blue and Wright encourages him to pursue martyrdom and support ISIS).

This evidence is sufficient to prove that the defendant and his conspirators (including ISIS member - Abu Hussain Al Britani) were working under ISIS's direction or control and in coordination with its stated objectives.  *See* 18 U.S.C. § 2339A(h) (definition of personnel).  For instance, in *United States v. Mehanna*, 735 F.3d 32, 48-49 (1st Cir. 2013), the First Circuit Court of Appeals affirmed the defendant's conviction and found sufficient evidence of a violation of Section 2339B where Mehanna had translated Arabic language materials, which supported Al-Qaeda and violent jihad, into English and posted them on a website, and traveled to Yemen in search of a training camp but was unsuccessful in finding one.  The *Mehanna* Court concluded that the question as to "whether enough coordination existed to criminalize the defendant's translations" was properly left to the jury.  *Id.* at 49.  Similarly, the Supreme Court stated in *Holder v. Humanitarian Law Project ("HLP")*, 561 U.S. 1, 130 S.Ct. at 2705, 2723 (2010), "advocacy performed in coordination with, or at the direction of," an foreign terrorist organization constitutes a violation of Section 2339B.  The First Circuit further concluded that a direct link to a FTO "is neither required by statute nor mandated by *HLP*."  *Mehanna*, 735 F.3d at 50.

Thus, there is sufficient evidence that the defendant and his conspirators agreed to provide a service or commit attacks in the United States in coordination with or at the direction of ISIS (a group that the parties have stipulated is a FTO).  Wright swore allegiance to the leader

of ISIS (*see* Ex. 51, 65, and 9/21/17 Tr. at 22, 32) and was acting in coordination with its orders and statements.  Additionally, one of the defendant's conspirators was in direct contact with an ISIS member, Abu Hussain Al Britani.  This conduct demonstrates far greater contact with a FTO than that in *Mehanna*.  While Mehanna did travel overseas to find a training camp, he was unsuccessful and returned to the United States without ever meeting an Al Qaeda member.  735 F.3d at 45-46.  He also never had direct communications with any Al Qaeda members.  Wright's motion should therefore be denied with regard to Count One.

III.    **Sufficient Evidence Exists that Conspiracy to Kill A Person in the United States Charged in Count Four Involved Conduct that Transcended National Boundaries.**

At the outset, the government notes the defendant's contention that the government is required to prove that the defendant knew and intended that the conspiracy to kill would transcend national boundaries.  *See* Def. Mot. at 2.  The language of the Section 2332b, however, shows that the Congress only requires the government to show that the prohibited act such as a killing "involved conduct transcending national boundaries."[1]  Congress did not require the government to prove that the defendant knew that the act indeed involved conduct transcending national boundaries.  Section 2332b does not contain an explicit *mens rea* requirement.  The placement of the phrase "transcending national boundaries" in the statute also shows that

---

[1] 18 U.S.C. § 2332b(a) makes the following a crime:

(1) Offenses - Whoever, involving conduct transcending national boundaries and in a circumstance described in section (b) –

(A) Kills, kidnaps, maims, commits an assault resulting in serious bodily injury, or assaults with a dangerous weapon any person within the United States; …

in violation of the laws of any state, or the United States, shall be prescribed in subsection (c).

6

Congress treated it as jurisdictional element rather than substantive conduct element.  The

Supreme Court has cautioned lower courts to read into the statute "*only* that *mens rea* which is

necessary to separate wrongful conduct from 'otherwise innocent conduct.'"  *Elonis v. United

States*, 135 S. Ct. 2001, 2010 (2015) (emphasis added).  Thus, the presumption does not apply to

facts that confer federal jurisdiction, or are otherwise unrelated to the defendant's culpability.

*See X-Citement Video, Inc.*, 513 U.S. 64, 73 (1994) (citing *United States v. Feola*, 420 U.S. 671

(1975)).

Based upon a fair reading of the statute, the government believes that it should only be

required to prove that the defendants knowingly conspired with others to kill and maim any

person within the United States in violation of the laws of Massachusetts and New York, as

charged in the Second Superseding Indictment.  Further, although the transnational nature of the

conduct is what makes the individual liable under § 2332b (as opposed to another criminal

statute), that consideration is insufficient to require a court to read a *mens rea* requirement into

the phrase.  *See id.* at 72 n.3 ("Criminal intent serves to separate those who understand the

wrongful nature of their act from those who do not, but does not require knowledge of the

precise consequences that may flow from that act once aware that the act is wrongful.").

The legislative history of 18 U.S.C. § 2332b provides further support for the proposition

that no *mens rea* is required with respect to the phrase "transcending national boundaries" and

the government must only prove that some conduct, not "meaningful" or significant conduct,

occurred outside the United States.  The Conference Report on the Antiterrorism and Effective

Death Penalty Act of 1996 (AEDPA), which enacted § 2332b, makes clear that the transnational

conduct element is jurisdictional in nature:

> This section creates a new federal criminal prohibition on acts of terrorism
> transcending national boundaries . . . *There will be federal jurisdiction* over the

offense if the offender uses facilities of interstate commerce, the offense interferes with interstate commerce, the victim is the United States or any employee of the United States, or the offense takes place in U.S. territorial jurisdiction, *and at least part of the conduct occurred outside of the United States.*

H. REP. 104-518 (1996) (Conf. Rep.) (emphasis added).   Accordingly, communication with a person outside the United States is sufficient to meet the "transcending national boundaries" element.

In addition, while the government believes there is sufficient circumstantial evidence to conclude that Rahim spoke to Junaid Hussain and that Junaid Hussain's alias was Abu Hussain Al Britani, as this Court has already concluded, it is sufficient for the government to prove that Rahim spoke to Abu Hussain Al Britani to prove the conspiracy involved conduct transcending national boundaries.

### A. Statements of Abu Hussain Al Britani, Zulfi Hoxha, and Abu Antar were all Properly Admitted as Co-Conspirator Statements.

Admission of a co-conspirator statement requires that four elements be satisfied by a preponderance of the evidence: 1) a conspiracy must have existed; 2) the defendant must have been a member of it; 3) the declarant must also have been a member; and 4) the declarant's statement must have been in furtherance of the conspiracy.  *United States v. Colón-Díaz*, 521 F.3d 29, 35-36 (1st Cir. 2008); *United States v. Marino*, 277 F.3d 11, 25 (1st Cir. 2002).  The statement need only further any conspiracy, not necessarily the one charged.  *United States v. Maliszewski*, 161 F.3d 992, 1008 (6th Cir. 1998).

Consistent with First Circuit jurisprudence, the Court conditionally admitted the co-conspirator statements and made its final determination that a conspiracy existed after the government rested.  *United States v. Ciampaglia*, 628 F.2d 632, 638 (1st Cir. 1980); *United States v. Petrozziello*, 548 F.2d 20 (1st Cir. 1977).  In making its *Petrozziello* determination, the

8

Court may "consider any evidence whatsoever, bound only by the rules of privilege," including the proffered statements themselves. *Bourjaily v. United States*, 483 U.S. 171, 178 (1987); *United States v. Isabel*, 945 F.2d 1193, 1199 (1st Cir. 1991). Indeed, hearsay and other inadmissible evidence can be considered. *See United States v. Drougas*, 748 F.2d 8, 28-29 (1st Cir. 1984). There was sufficient evidence for the court to conclude that beginning in late 2014 and January 2015, the defendant had conspired with Rahim, Rovinski, Zulfi Hoxha, and others to provide material support to ISIS. Initially, the four men were planning to travel overseas to support ISIS. Rahim sought the assistance of two people overseas in traveling to Syria, Abu Hussain Al Britani and Abu Antar. Rahim's statements to both Abu Hussain Al Britani and Abu Antar were clearly in furtherance of the conspiracy and Abu Antar agreed to support Rahim in his efforts to join ISIS. Thus, in addition the entirety of these communications being admissible as co-conspirator statements, Rahim's statements to Abu Antar and Abu Hussain on Kik regarding his interest in traveling to Syria in February 2015 are at a minimum, admissible as statements by Rahim in furtherance of a conspiracy.

Rahim's request for assistance from Hussain and Abu Antar in traveling to Syria to join ISIS was intended to promote the goal of the conspiracy to provide material support to ISIS. The fact that these statements related to traveling to Syria to support ISIS rather than committing attacks in the United States does not render them inadmissible. Each terrorism-oriented thought or plan does not constitute a separate conspiracy. Indeed, the First Circuit rejected such an argument in *Mehanna*. 735 F.3d at 56. In *Mehanna*, the defendant claimed the district court erroneously admitted statements of Mehanna's co-conspirator, Ahmed Abousamra, under Fed. R. Evid. 801(d)(2)(E), which occurred prior to the formation of the charged conspiracy. *See id.* at 56-57. The First Circuit found no error in the district court's introduction of statements that were

9

made in 2001, years before Mehanna traveled to Yemen in 2004 in search of a terrorist training

camp with Abousamra and another conspirator because the Court determined that a conspiracy

existed in 2001 when the defendant and his conspirators "agreed to participate in jihad against

the United States." *Id.*   In so doing, the First Circuit concluded:

> That the conspiracy shifted its focus from Pakistan to domestic attacks and then to
> Yemen did not rob it of its essential purpose: waging jihad against the United
> States.  The means may have changed from time to time, but the end remained the
> same.
> Once this essential purpose is understood, it becomes evident that none of the
> statements at issue predate the formation of the relevant conspiracy.

*Id.*; *accord United States v. Sepulveda*, 15 F.3d 1161, 1173 (1st Cir. 1993) (a conspiracy may

"shift its priorities from time to time without sacrificing its essential identity.").  Like in

*Mehanna*, while the essential purpose of Wright's agreement with his conspirators remained the

same -- to provide material support to ISIS -- the means of providing that support changed over

time.  Initially, the conspirators discussed traveling overseas to join ISIS but by February 2015,

Wright was plotting with Rahim (and later Rovinski) to commit attacks in the United States.

Accordingly, statements of Zulfi Hoxha, Abu Antar, and Abu Hussain Al Britani were

properly admitted as co-conspirator statements because they had become members of the

conspiracy to provide material support to ISIS through traveling to Syria.  Indeed, both Rahim

and Wright encouraged Hoxha to join ISIS and assisted him in providing information to travel

overseas.  *See, e.g,* Ex. 379 (Rahim requested permission from Abu Antar to share the ISIS

phone number in Turkey with Hoxha).

Hussain's tweets contained in Exhibits 118-120 to "Kill Those that Insult the Prophet"

and describing Rahim as a martyr who intended to kill Pamela Gellar also constitute co-

conspirator statements under 801(d)(2)(E).  Hussain was a co-conspirator in the plot to commit

violent attacks in the United States and kill Geller.  He conspired with at least one of Wright's

co-conspirators, Rahim, to provide material support to ISIS.  According to Rahim's statements to

Wright on the May 26, 2015 recorded call, Mr. Hussain provided assistance in the form of

"secure document" for the beheading of Geller.  Hussain also instructed Rahim to kill Geller

consistent with his public statements on Twitter in May 2015.  When Rahim and his conspirators

failed to kill Geller, Hussain made statements on Twitter on June 12, 2015 encouraging others to

join in the conspiracy to kill Geller, become a martyr like Rahim, and provided Geller's precise

address for targeting her.  *See United States v. Shea*, 211 F.3d 658, 668 (1st Cir. 2000)

(statements made for purpose of recruiting new members into the conspiracy or passing

information between conspirators constituted statements made in furtherance of conspiracy under

Rule 801(d)(2)(E)); *United States v. Haynes,* 582 F.3d 686, 705 (7th Cir. 2009) ("statements

intended to recruit other conspirators qualify as statements in furtherance of a conspiracy.");

*United States v. Lee*, 374  F.3d 637, 644 (8th Cir. 2004) ("statements made to recruit new

members are in furtherance of the conspiracy."); *United States v. Holloway,* 740 F.2d 1373, 1376

(6th Cir. 1984) (holding statements made to recruit an individual to join a conspiracy were

admissible as statements made in furtherance of conspiracy).

In addition, the fact that Rahim died and Wright and Rovinski were arrested on

June 2, 2015 did not terminate the conspiracy.  *See United States v. Mangual-Santiago*, 562 F.3d

411, 422-423 (1st Cir. 2009) (rejecting argument that conspiracy was abandoned or terminated

while the defendant was in jail because once conspiracy exists, the law presumes it continues to

exist and each conspirator continues to be a participant in it unless a conspirator "makes 'an

affirmative showing' that the conspiracy was abandoned or terminated, or that he withdrew from

it.") (citation omitted); *United States v. Pizarro-Berrios*, 448 F.3d 1, 10 (1st Cir. 2006)

(concluding that arrest of conspirator does not by itself terminate or serve as evidence of a withdrawal from a conspiracy; "'in order to withdraw from a conspiracy, a conspirator must act affirmatively either to defeat or disavow the purposes of the conspiracy.'") (citation omitted); *United States v. Robinson*, 390 F.3d 853, 882 (6th Cir. 2004) (stating that, even assuming that after his arrest the defendant was no longer an active participant in the conspiracy, "he is nonetheless presumed to be a continuing member, and is chargeable for the subsequent acts of co-conspirators, so long [as] the conspiracy was ongoing and [the defendant] did not establish his affirmative withdrawal from the conspiracy."); *United States v. Mealy*, 851 F.2d 890, 901 (7th Cir. 1988) (concluding that a "co-conspirator's arrest does not automatically terminate a conspiracy").  Indeed, Rovinski continued to take actions in furtherance of the conspiracy after his arrest as illustrated by the prison letters he wrote to Wright in August 2015.  *See* Tr. 9/21/17 at 62 (Rovinski); Exs. 73-74.  The defendant has failed to make an affirmative showing that he withdrew from the conspiracy when he was arrested and therefore it continued until at least August 2015.

### B.  Evidence is Sufficient to Prove Abu Hussain Al Britani was Overseas.

The defendant himself admitted to the FBI cooperator during their chat conversations that he and his conspirators had spoken to the "Mujahideen" (i.e., ISIS fighters) in Syria.  *See* Ex. 51 (Unseen chats).  This constitutes direct evidence that the defendant and co-conspirators were in communications with people in Syria.  Mujahideen is Arabic word meaning fighters.  Mujahid refers to a single fighter.  *See* Ex. 7 at 4.  The defendant stated "the Mujahideen in Syria told us" that they couldn't release the specific names and addresses of the other ISIS fighters located in the United States.  From this statement, the jury could infer that the defendant was either in direct communications with ISIS members located in Syria or that he had knowledge of Rahim's

12

communications with ISIS members in Syria.  According to the testimony of Chief Bailey, the defendant also acknowledged that "Rahim did in fact have a contact overseas following his pledging bayah to the Islamic State or allegiance to the Islamic State."  9/25/17 Tr. at 16.

Beginning in or around February 2015 when the defendant, Rovinski, Rahim, and Hoxha were planning to travel overseas to join ISIS, Rahim communicated with two people located overseas -- Abu Antar and Abu Hussain Al Britani.  *See* Exs. 356, 377-379.   Exhibit 377 contains screenshots of a conversation between Abu Antar and Rahim that occurred in February 2015.  (Excerpt of Kik Chats found on Rahim's Tablet).  A copy of the text and associated user data (i.e., time, sender, recipient, and message) for these same Kik chats were also found on Rahim's Samsung phone, which he was using at the time of the confrontation with law enforcement on June 2, 2015.  *See* Ex. 356.  In these messages, Rahim seeks the assistance of Abu Antar in traveling overseas and to join ISIS.  In response, Abu Antar gives Rahim a phone number with a Turkey country code to call when he arrives in Turkey and advised him not to call it until he arrives in Turkey.  *Id.*; 9/28/17 Tr. at 32-33.  Rahim expressed concern about "Abu Hussein."  *See* Ex. 356.  Rahim asked Abu Antar, "what if abu Hussein forget me again."  Abu Antar told Rahim not to worry.  Abu Antar promised that he would "see him [Abu Hussein] and remind him [Abu Hussein]."  Ex. 356.  From these communications, a jury can infer that, like Abu Antar, Abu Hussain was also located overseas near Turkey.  Additionally, Abu Antar assured Rahim "they will not leave you in Turkey[.]  They will bring you in then confirm with him [Abu Hussein]."  Ex. 356.   The only reasonable conclusion from these chat conversations is that Rahim was seeking to travel overseas to join ISIS, that he contacted people who were members of ISIS and located overseas, and both Abu Antar and Abu Hussain were located in or

13

near Turkey.  During trial, the government repeatedly established, including using a map (Ex. 402), that Turkey borders Syria, which in 2015 was the headquarters of ISIS.

Additionally, Rahim had direct communications with "Abu Hussain Britani" at around the same time as Abu Antar.  Rahim asked Abu Hussain to vouch or recommend him when he arrived in Syria.  Abu Hussain responded that he could not vouch for anyone he did not personally know because of the nature of his work over there but gave Rahim a number that contained a country code.  Ex. 378; 9/28/17 Tr. at 60.  The jury can rationally infer from this conversation that "Abu Hussain Britani" offered to assist Rahim in identifying someone who could vouch for him when he arrived in Turkey and awaited entry into ISIS-controlled territory in Syria.

In addition to demonstrating that Rahim was successful in reaching "Abu Hussain Britani," these Kik chats contain a profile image of "Abu Hussain Al Britani," which Abu Hussain has also used in more than 20 of his Twitter accounts, including @AbuHussain101, @AbuHussain102, @AbuHussain103, @AbuHussain104, @AbuHussain105, @AbuHussain106, @AbuHussain107, @AbuHussain1337, @AbuHussain1337_, @AbuHussainIS, @AbuHussain_911, @AbuHussain010, @AbuHussain110, @AbuHussain112, and @AbuHu55ain.  *See* 10/10/17 Tr. at 106-107 (Claire Mills); 9/28/17 Tr. at 72-96 (Alexandra Kassirer).  Both Ms. Mills and Ms. Kassirer testified that they were monitoring these accounts and based upon numerous similarities (the profile picture, name, contact information, content of the tweets, and followers) believed they belonged to a single person who used the alias "Abu Hussain Al Britani."  *See* 10/10/17 at 107-111; 9/28/17 Tr. at 72-96.

Both Ms. Mills and Ms. Kassirer described Abu Hussain Al Britani similarly.  Ms. Kassirer testified that he was "a significant influencer within the online ISIS community, [and]

14

he was very aggressive in his rhetoric."  9/28/17 Tr. at 76.  "Abu Hussain Al Britani" or "the Briton" called on "supporters to attack certain targets, he was specific about them, down to their specific addresses."  *Id.*  Ms. Mills testified that using his Twitter accounts, Abu Hussain Al Britani "would talk about ISIS, he'd talk about Syria, he would promote attacks on the West, and often talked about jihad."  10/10/17 Tr. at 107-108.  One of the accounts both Ms. Kassirer and Ms. Mills identified as belonging to Abu Hussain Al Britani was @AbuHussain1337_.  According to an ISIS book that the defendant shared with Rovinksi and Rahim, the person who used this twitter account "live[d] in the Islamic State.  They have a Surespot and other private messaging apps.  If their Twitter is banned, they will always make a new one."  *See* Islamic State 2015 E-book, Ex. 214 at 98.  According to the testimony of Ms. Kassirer and Ms. Mills that is exactly what Abu Hussain Al Britani did and why he had so many Twitter accounts.

In numerous Abu Hussain Twitter accounts, including two that Rahim was following on the tablet and a cell phone -- @AbuHussain_911 and @AbuHussain010 -- "Abu Hussain Al Britani" advertised a Surespot account: "abuhussain3."  *See* Exhs. 367, 382.  Special Agent Shayne Tongbua testified that records obtained from Surespot, an encrypted social media platform, and Google indicated that Rahim was Surespot user "ninjak."  Tr. 9/28/17, Vol. 1, p. 18-22.  The records reveal that Rahim and "abuhussain3" exchanged messages via Surespot on May 21, 2015.  Abu Hussain Al Britani's tweets also confirm that he indeed spoke to Rahim in May 2015 about beheading Pamela Geller.  *See* Ex. 119.  Based upon all of this evidence and inferences that can be reasonably drawn from the exhibits and testimony, there is sufficient evidence for the jury to conclude that: Rahim communicated with Abu Hussain Al Britani; Abu Hussain Al Britani was located overseas in the Islamic State; and Abu Hussain talked to Rahim about beheading Pamela Geller and gave Rahim an encrypted document containing details about

15

her.  *Compare* Ex. 120 (containing Pamela Geller's street address) to Ex. 57A (transcript regarding secure document Mr. Hussain provided to Rahim containing all the details about Geller).  As described above, Geller was the subject of an ISIS fatwa for organizing a May 2015 Draw the Prophet Muhammad contest.

### C.   Evidence is Sufficient to Prove Junaid Hussain Used Alias Abu Hussain Al Britani and Hussain was Located Overseas.

As the Court has already concluded there is enough evidence for a jury to find that Twitter user "Abu Hussain Al Britani" conspired with Wright, Rahim, and Rovinski.  Mot. Hrg. Tr. 10/10/2017, at 17.  Additionally, the Court has properly determined the government is not required to establish that "Abu Hussain Al Britani," or "Abu Hussain the Briton," was Junaid Hussain, in order to prove the "conduct transcending national boundaries" element of 18 U.S.C. § 2332b.  9/28/17 Tr. at 5-6.  The totality of the circumstantial evidence viewed in the most favorable light to the government, however, demonstrates that "Abu Hussain Al Britani" was Junaid Hussain, a citizen of the United Kingdom, who traveled to Syria in August 2013, became a member of ISIS and played a significant role in the ISIS online community in directing attacks against the West, and communicated and conspired with Rahim in relation to the killing of Pamela Geller.

In the May 26, 2015 call between the defendant and Rahim, Rahim informed the defendant that he had been in contact with a person named "Mr. Hussain."  *See* Ex. 57A at 3. This is significant because Rahim had previously only referred to "Hussain" by his alias "Abu Hussain."   From Rahim's use of the name "Mr. Hussain" in May 2015 conversation, the jury can infer that, by that time, Rahim had learned that Hussain was indeed this person's last name. During the May 26 call, the defendant initially assumed that Rahim was talking about their mutual associate "Mr. Hoxha."  *See* Ex. 57A at 3.  In his statement to Chief James Bailey, the

16

Defendant admitted that he was aware that Hoxha had traveled to Syria to join ISIS. *See* Tr. 9/22/17 at 64-65. This is confirmed by travel records that show that Hoxha traveled to Turkey in April 2015. *See* Ex. 48 (travel records showing Hoxha departed United States in April 2015 and flew to Turkey and has never returned). According to the defendant, Hoxha had overseas contacts in Turkey who would facilitate his travel to Syria once he arrived in Turkey. *See* 9/22/17 Tr. at 65. Additionally, during the May 26, 2015 conversation, Rahim told the Defendant that "Mr. Hussain" had spoken to "Mr. Hoxha" when he "crossed over" and "Mr. Hussain" was "100% sure" that Hoxha was in "training." Ex. 57A at 3. The jury can infer from this conversation that "Mr. Hoxha" was in an ISIS training camp in Syria and that "Mr. Hussain" held a position with ISIS in Syria, such that he would have knowledge about and access to ISIS recruits in Syria.

Rahim then informed the defendant that "Mr. Hussain" had provided Rahim with an encrypted file containing information about Pamela Geller, their beheading target. *See* Ex. 57A at 3-4. Rahim further described "Mr. Hussain" as a "straight up hacker." According to Ex. 391, Junaid Hussain was convicted of computer hacking crimes in the United Kingdom. This is circumstantial evidence that Junaid Hussain had the skills of a computer "hacker" and that, giving all favorable inferences to the government, that Junaid Hussain was the "Mr. Hussain" who was discussed in the call.

The evidence further connects Junaid Hussain to the alias "Abu Hussain Al Britani," or Mr. Hussain "the Briton." According to Detective Constable Linda Gore, Junaid Hussain was investigated by the West Midlands Police Counterterrorism Unit beginning in May 2014. 10/10/17 Tr. at 55. As part of that investigation, Claire Mills, an Intelligence Development Officer who conducts research in support of counterterrorism investigations in the United

17

Kingdom, was assigned to identify any social media accounts belonging to Hussain.  10/10/17 Tr. at 12.  Using information obtained during the course of the investigation, Ms. Mills was able to personally identify ten Twitter accounts that were linked to Junaid Hussain.  *Id.* at 15-16.  One of the Twitter accounts that she identified in the investigation was @AbuHussain1337_.  *Id.* at 18-19; Ex. 400.  Ms. Mills further testified that these accounts all had the same profile name, "Abu Hussain Al Britani," and the same profile picture.  10/10/17 Tr. at 14, 17.  This is the same profile picture found in the Kik chats found on Rahim's tablet and Tweets belonging to the person named "Abu Hussain Al Britani" as well as the tweets issued by Mr. Hussain after speaking to Rahim.  *See* Exs. 367, 378, 119.   As described above, according to Ms. Mills, Abu Hussain's Twitter accounts contained similar pro-ISIS language, discussion of Syria, jihad, and attacks on the West.  10/10/17 Tr. at 16-17.   Based on those common factors, Ms. Mills believed that all of the Twitter accounts she identified belonged to the same user, Junaid Hussain.  Id. at 15-16.  Most significantly, Ms. Mills testified that the activity on all of the Twitter accounts associated with Junaid Hussain -- the "Abu Hussain Al Britani" accounts -- stopped in August 2015, after Hussain was reportedly killed, and that, as a result no additional accounts were being monitored.  *Id.* at 20-21.

As indicated above, this assessment was also made by Alexandra Kassirer, who had monitored approximately 20 "Abu Hussain Al Britani" accounts in the 2014-15 timeframe.  *See* 9/28/17 Tr. at 72.  Ms. Kassirer testified that she observed that the accounts all used the name "Abu Hussain Al Britani," the same profile image, the advertisement of the same alternate social media accounts on the profile page, the commonality among Twitter followers, the "shout out" that "Abu Hussain Al Britani" had returned after a suspension, the threatening language in the content of the tweets, and the consistent use of hashtags like "go forth" amongst the accounts.

18

*Id.* at 73-75.  Further, Ms. Kassirer explained that the reason Abu Hussain had so many Twitter accounts was that his accounts were repeatedly suspended by Twitter for Terms of Service violations because of their pro-ISIS content.  *Id.* at 72-73.

One of Hussain's accounts, @AbuHussain1337_, was listed in an ISIS book, entitled "Hijrah to the Islamic State," which contains guidance as to how to travel to Syria.  *See* Ex. 307. Consistent with that guidance, Rahim contacted "Abu Hussain Al Britani" about facilitating his travel to Syria (see, Ex. 378), which is consistent with the advertisement of his Twitter account @AbuHussain1337_ in the ISIS propaganda that the defendant shared with Rahim.  When viewed in the light most favorable to the government, there is sufficient evidence to establish that "Abu Hussain Al Britani" was outside of the United States when Rahim communicated with him about the plot to kill Gellar and Junaid Hussain was using the alias "Abu Hussain Al Britani."

The government has further established Junaid Hussain was a citizen of the United Kingdom and traveled from the United Kingdom to an area of Turkey adjacent to its border with Syria in mid-2013.  *See* Ex. 392; 10/10/17 Tr. at 82-84.  Prior to his departure, Junaid Hussain was convicted of a computer hacking offense.  *See* Ex. 391.  The booking photo from a separate incident in 2013, just before Hussain left for Turkey, reveals physical features that resemble those found in the profile picture of "Abu Hussain Al Britani," which was featured in more than 20 Twitter accounts that Hussain used to spread ISIS propaganda and direct attacks on the West. Compare Exhs. 390 and 119.  Claire Mills further testified that all online Twitter activity from "Abu Hussain Al Britani" ended in August 2015 when Junaid Hussain was killed.  10/10/17 Tr. at 20-21.  When viewed in the light most favorable to the government, the jury can infer from these exhibits and testimony that: Rahim was in contact with a person located overseas; this person was Junaid Hussain using the alias "Abu Hussain Al Britani;" Junaid Hussain joined the

conspiracy through Rahim; Junaid Hussain was a member of ISIS located in Syria; and Junaid

Hussain provided Rahim an encrypted document that related to the beheading plot.  That

evidence is more than sufficient to prove the "transcending national boundaries" element of

Count Four of the indictment.  See *United States v. Kwong*, 14 F.3d 189, 193 (2$^d$ Cir. 1994)

("Identity can be inferred through circumstantial evidence").


## CONCLUSION

For these reasons, the government respectfully requests that the Defendant's Motion for a

Judgment of Acquittal.


Respectfully submitted,

WILLIAM D. WEINREB
Acting United States Attorney
District of Massachusetts

By:    /s/ B. Stephanie Siegmann
B. Stephanie Siegmann
Assistant U.S. Attorney

Gregory R. Gonzalez, Trial Attorney
U.S. Department of Justice, National Security Div.


## CERTIFICATE OF SERVICE

I hereby certify that this document was sent via e-mail to counsel for the defendant on
this 16th day of October, 2017.

/s/ B. Stephanie Siegmann
B. Stephanie Siegmann
Assistant United States Attorney

20