UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>v. )<br>) 15-cr-10153-WGY<br>DAVID WRIGHT, )<br>)<br>Defendant. )<br>) | |

**MEMORANDUM OF LAW IN SUPPORT OF
MOTION OF TRUSTEES OF BOSTON UNIVERSITY TO INTERVENE
AND TO UNSEAL JUROR NAMES AND ADDRESSES**

INTRODUCTION

The First Circuit has long held that the names and addresses of jurors in criminal trials must be made public after a verdict is rendered, absent the "exceptional" circumstance of a "significant threat to the judicial process itself." *U.S. v. Hurley*, 920 F.2d 88, 91 (1st Cir. 1990), citing *U.S. v. Doherty*, 675 F.Supp. 719, 723 (D.Mass. 1987). WBUR, the public radio station owned and operated by Intervenor Trustees of Boston University (referred to hereinafter as "WBUR"), moves to intervene in this action for the purpose of requesting that the Court unseal the jurors' names and street addresses shortly after the jury renders its verdict in this case, and submits this memorandum of law in support of that motion.

The Government does not object to the relief requested in WBUR's motion. WBUR has been unable to contact counsel for the defendant on this matter.

FACTS

This trial has attracted considerable public interest and media attention, including reporting by WBUR. The media has reported on, among other things, the circumstances of

defendant David Wright's arrest, the themes of the prosecution and the defense at trial, and the pseudonymous testimony of the government's confidential informant.[1] WBUR seeks the identities of the jurors in this case to further its reporting on this matter.

WBUR has requested the disclosure of juror names and addresses in other cases in this judicial district, including in the recently-concluded trials of *U.S. v. Cadden*, 14-10363-RGS, and *U.S. v. Fidler*, 15-10300-DPW. (Affidavit of David Boeri, ¶¶ 2, 5). In *Cadden*, the Court released only the names and *towns of residence* of the jurors, not their street addresses. (Id., ¶ 2; 14-10363-RGS, Doc. No. 1144. Notwithstanding the efforts of WBUR reporter David Boeri and several other members of the newsroom staff, WBUR was unable to obtain any contact information whatsoever for two of the *Cadden* jurors, and was unable to confirm the accuracy of its contact information for a third. (Boeri Aff., ¶ 4). In *Fidler,* by contrast, the Court released the jurors' names and street addresses to WBUR, giving it reliable information with which to contact each of the jurors in the case for comment. (*Id.*, ¶¶ 5-6).

## ARGUMENT

### I. WBUR HAS A RIGHT OF PROMPT POST-VERDICT ACCESS TO JUROR NAMES AND ADDRESSES.

Under the First Amendment and the District of Massachusetts jury plan, the names and addresses of jurors must be provided to the press and the public promptly after conclusion of the trial, "absen[t] . . . particularized findings reasonably justifying non-disclosure." *United States v.*

---

[1] Jess Bidgood and Dave Philipps, "Boston Terror Suspect's Shooting Highlights Concerns over Reach of ISIS," *New York Times*, June 3, 2015; Jacob Geanous, "New Charge for Everett Man Linked to Terror Plot," *Boston Globe*, Feb. 16, 2017; Benjamin Swasey, "Boston Leaders: Video Shows Man Under Terror Surveillance Was Not Shot in Back," *wbur.org*, June 3, 2015; David Boeri, "Trial Opens for Everett Man Accused of Plotting to Kill Americans for ISIS," *wbur.org*, Sept. 20, 2017; Michele McPhee, "College Grad who Worked Undercover to Take Down Terrorists Since Age 16 Testifies in US Court," abcnews.go.com, Sept. 27, 2017.

*Hurley*, 920 F.2d 88, 98 (1st Cir. 1990), citing *United States v. Doherty*, 675 F.Supp. 719 (D. Mass. 1987).[2] To justify impoundment of juror names and addresses "after the trial has ended, the court must find a significant threat to the judicial process itself," such as a determination "that the personal safety of the jurors would . . . be compromised by revealing their identities." *Hurley*, 920 F.2d at 91.

In *Hurley*, the district court denied a request by the *Boston Globe* for post-verdict access to the juror list because the jurors "explicitly expressed a desire that their names and addresses not be revealed to the press," and in the court's view, interviews about the content of jury deliberations would "demean the administration of justice." *Hurley*, 920 F.2d at 90 n. 1. On appeal, the First Circuit held this was improper under the terms of Section 10(c) of the District of Massachusetts Plan for Random Selection of Jurors, (now embodied in § 10(a) of the document) (the "Plan"), which provided that a court could order the names of jurors to remain confidential after they "have appeared, or failed to appear, in response to the summons" only if the "interests of justice so require." The First Circuit construed the "interests of justice" standard in the Plan narrowly, "as requiring that the trial court find specific and convincing reasons why, in the particular case, the juror identities are required to be withheld," a result that should be realized "only in an exceptional case." *Id.* at 93.

The *Hurley* court construed the "interests of justice" language in this manner to avoid conflict with the First Amendment, which "protects the right of the press and the public to attend

---

[2] Intervention for the limited purpose of seeking to unseal court records is a recognized method for a media entity to vindicate the public's right of access to criminal proceedings. *In re Boston Herald, Inc.*, 321 F.3d 174, 177 (1st Cir. 2003) (noting allowance of media entity's motion to intervene in criminal case for purpose of pursuing access request); *U.S. v. DiMasi,* No. 09-cr-10166-MLW, Doc. 378 (March 16, 2011), at 9 (allowing motion of *Boston Globe* to intervene "to the extent that the court is unsealing" portions of an affidavit on file with the court); *U.S. v. Doherty*, 675 F. Supp. 719 (D.Mass. 1987) (noting allowance of motions of media to intervene to seek access to names and addresses of jury members).

3

criminal proceedings, together with the 'right to gather information.'" *Hurley*, 920 F.2d at 94, quoting *Branzburg v. Hayes*, 408 U.S. 665, 681 (1972), *Richmond Newspapers v. Virginia*, 448 U.S. 555 (1980). The right of access to criminal trials and documents is "rooted in the historic common law public character of criminal proceedings since the Norman Conquest in England and the United States Constitution as an 'indispensable attribute of an Anglo-American trial.'" *Id.*, quoting *Richmond Newspapers,* 448 U.S. at 569. It also helps ensure the proper functioning of courts, by, among other things:

> assuring that proceedings are conducted fairly; discouraging perjury, misconduct of participants, and biased decisions; prophylaxis as an outlet for community hostility and emotion; ensuring public confidence in a trial's results through the appearance of fairness, and inspiring confidence in judicial proceedings through education regarding the methods of government and judicial remedies.

*Hurley*, 920 F.2d at 94 (internal quotations omitted); *see also Press-Enterprise Co. v. Superior Court of California for Riverside County*, 478 U.S. 1, 8 (1986) (courts must consider the "two complementary considerations" of "history," or whether "the place and process have historically been open to the press and general public," and "logic," or "whether public access plays a significant positive role in the functioning of the particular process in question," in deciding whether First Amendment access right attaches).

"Knowledge of juror identities," the *Hurley* court continued, serves many of these salutary purposes. It allows the public:

> to verify the impartiality of key participants in the administration of justice, and thereby ensures fairness, the appearance of fairness and public confidence in that system. It is possible, for example, that suspicions might arise in a particular trial (or in a series of trials) that jurors were selected from only a narrow social group, or from persons with certain political affiliations, or from persons associated with organized crime groups. It would be more difficult to inquire into such matters, and those suspicions would seem in any event more real to the public, if names and addresses were kept secret. Furthermore, information about jurors, obtained from the jurors themselves or otherwise, serves to educate the public regarding the judicial system and can be important to public debate about its strengths, flaws

4

2801652.v1

and means to improve it. Although the district judge here assumed that the Globe sought access solely to inquire into the deliberative process, other avenues of inquiry are conceivable. Juror bias or confusion might be uncovered, and jurors' understanding and response to judicial proceedings could be investigated. Public knowledge of juror identities could also deter intentional misrepresentation at voir dire.

*Hurley*, 920 F.2d at 94.[3]

Accordingly, the *Hurley* Court imposed a demanding standard: to justify the withholding of juror names and addresses after a verdict is rendered, "the court must find a significant threat to the judicial process itself," such as a determination "that the personal safety of the jurors would . . . be compromised by revealing their identities," or the likelihood of "other evils, such as jury tampering." *Hurley*, 920 F.2d at 91, 99. Such a determination must be supported by "particularized findings reasonably justifying the non-disclosure," failing which "the juror names and addresses must be made public." *Id.* at 98.

Here, there is no indication that releasing the names of the jurors would compromise juror safety or lead to any of the "other evils" contemplated in *Hurley*, notwithstanding that the

---

[3] Access to juror identities is also a matter of longstanding tradition in the Commonwealth of Massachusetts, as recently observed by the Supreme Judicial Court in *Com. v. Fujita*, 470 Mass. 484, 486 (2015) (holding press has right of access to jury list under Massachusetts common law). "For example, jury selection in the 1770 prosecutions of the British soldiers charged with the Boston Massacre was open to the public, and the identities of the jurors who acquitted the soldiers were known to the community. See 3 Legal Papers of John Adams 17–19, 49 n. 1, 99–100 (L. Wroth & H. Zobel eds. 1965). Similarly, in the 1806 trial of Thomas Selfridge, a prominent Boston attorney accused of shooting and killing the son of a political rival in the middle of the day on State Street, the jurors were drawn and publicly announced at the trial — the first being Paul Revere (who went unchallenged) — and were listed in the publicly available reports of the proceeding. See, e.g., Trial of Thomas O. Selfridge, Att'y at Law, Before the Hon. Isaac Parker, Esquire, For Killing Charles Austin on the Public Exchange, in Boston, August 4th, 1806, at 9 (Russell & Cutter, Belcher & Armstrong, Oliver & Munroe, and William Blagrow, 1807) (juror empanelment on Dec. 23, 1806). Similarly, in the 1849 trial of Professor John W. Webster for the murder of Dr. George Parkman (one of the most intensely followed and reported murder trials in the United States at the time), the jurors' names were publicly drawn at the beginning of the trial and published in special editions of the newspapers of the time. See, e.g., Trial of Professor John W. Webster for the Murder of Dr. George Parkman in the Medical College, at 6 (Boston Herald Steam Press, 1850) (listing names of jurors selected for trial)." *Id.*

defendant is charged with conspiracy to provide material support to a designated foreign terrorist organization. Accordingly, the jurors must be identified after the trial is over.

II. **THE *HURLEY* DECISION REQUIRES RELEASE OF JUROR ADDRESSES, NOT JUST TOWNS OF RESIDENCE.**

In *Hurley*, the First Circuit held that in the "absence . . . of particularized findings reasonably justifying non-disclosure . . . juror names *and addresses* must be made public." 920 F.2d at 98 (emphasis supplied). "[I]ndividual judges are limited, under the interests-of-justice standard set out in the District of Massachusetts plan, to withholding names *and addresses* in exceptional circumstances," the Court held, such as a threat to jurors' "personal safety." *Id.* (emphasis supplied). The *Hurley* court found a right of access to addresses because "[i]n the case of many familiar names, an address as well as the name is necessary to identify the individual." *Id.* at 93, n.6. Addresses, in other words, are necessary to vindicate *Hurley's* animating principle: that "[i]n a democracy, criminal trials should not, as a rule, be decided by anonymous persons." *Id.* at 91.[4] Indeed, even before *Hurley*, this Court held that "under the First Amendment, the public has a general right . . . to the names *and addresses* of the jurors discharging [the] important public trust" of jury service. *Doherty*, 675 F.Supp. at 723 (emphasis supplied).

WBUR's recent reporting experience has borne out the *Hurley* court's observation that identification of all trial jurors can be frustrated absent release of juror addresses. In *U.S. v. Cadden*, the court refused to release juror addresses, and provided only their towns of residence.[5]

---

[4] A common law or First Amendment right of access to juror addresses has been found by other courts as well. *In re Baltimore Sun*, 841 F.2d 74, 75 (4th Cir. 1988) ("After a jury has been seated, however . . . the names of those jurors are just as much a part of the public record as any other part of the case, and we think so also are their addresses in order to identify them."); *State ex rel. Beacon Journal Publ'g Co. v. Bond*, 98 Ohio St. 3d 146, 160 (Ohio 2002) (First Amendment right of access to names and addresses).

[5] The court stated it would not release juror home addresses because *Hurley's* treatment of the subject was relegated to "*dicta* in a footnote," and because *Hurley* "was written in a more innocent age." Order, *U.S. v. Cadden*, 14-10363-RGS, Doc. No. 1134. In fact, *Hurley's* treatment of juror addresses was part of its

6

2801652.v1

*See* Order, *U.S. v. Cadden*, 14-10363-RGS, Doc. No. 1134 (denying motion to reconsider denial of juror addresses). WBUR was unable to find any information concerning two of the 15 jurors whose names and towns of residence were provided, notwithstanding the efforts of several journalists over three days. (Boeri Aff., ¶¶ 2-3). In addition to the two jurors for whom WBUR could obtain absolutely no contact information, it was unable to verify the contact information for a third juror, from the town of Westford. (*Id.*, ¶ 4). By contrast, in *U.S. v. Fidler*, 15-10300-DPW, in which the Court released the names and addresses of all the jurors to WBUR, it was able to contact each of them. The release of this information also saved the jurors' extended family members—not to mention complete strangers—from receiving calls from WBUR reporters looking for the identified juror. (Boeri Aff., ¶¶ 5-6).

### III. THE COURT SHOULD RELEASE THE JUROR INFORMATION AS SOON AS POSSIBLE AFTER THE VERDICT IS RENDERED.

WBUR recognizes that by longstanding policy, the Court delays the release of juror names and addresses for a period of time after the verdict to permit them to resume their normal lives, reflect on their service, and consult with friends and family before receiving calls from the press. *U.S. v. Butt,* 753 F.Supp. 44 (1990) (articulating policy of waiting for period of seven days before releasing juror identities); *Doherty*, 675 F.Supp. at 724-25 (same); *see also United States v. Sampson,* 297 F.Supp.2d 348 (D.Mass. 2003) (postponing disclosure for seven days after death penalty trial). Nonetheless, any delay period here should be no more than a few days, to

---

core holding, and was not relegated either to *dicta* or to a footnote. *Hurley,* 920 F.2d at 98 ("We therefore hold that, given the absence here of particularized findings reasonably justifying non-disclosure, the juror names and addresses must be made public.") And, regardless of the merits of the court's suggestion that 1990 was a more "innocent age" than today, "[u]ntil a court of appeals revokes a binding precedent, a district court within the circuit is hard put to ignore that precedent unless it has unmistakably been cast into disrepute by supervening authority." *Eulitt ex rel. Eulitt v. Maine, Dept. of Educ.*, 386 F.3d 344, 349 (1st Cir. 2004); *Sarzen v. Gaughan,* 489 F.2d 1076, 1082 (1st Cir. 1973) (stare decisis requires lower courts to take binding pronouncements "at face value until formally altered").

permit the media to communicate with the jurors regarding their views of the case and the trial process before the jurors' views are influenced by the larger community's reaction to the verdict.

The courts have long recognized that "[a]s a practical matter . . . the element of time is not unimportant if press coverage is to fulfill its traditional function of bringing news to the public promptly." *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 561 (1976)); *see also Nebraska Press Ass'n v. Stuart*, 423 U.S. 1327, 1329 (1975) (Blackmun, J., in chambers) (where "suppressed information grows older . . . [o]ther events crowd upon it. To this extent, any First Amendment infringement that occurs with each passing day is irreparable."). In today's media- and social-media saturated environment, the risks of delay are heightened, because the jurors, after following the Court's instructions to read nothing about the case during the trial, may consume a great deal of information about it after the verdict, including social media postings reflecting views of the case and of the evidence by other members of the community. That information and community reaction could well influence the jurors' own stated views of the case or even their impressions of their jury service. WBUR respectfully submits that in the present environment, the salutary purposes of access to juror identities recognized in both *Doherty* and *Hurley* are best served by interviews with jurors shortly after the verdict, when their impressions and memories are fresh. In addition, there is no indication that a delay of a full week will be necessary in this case to give the jurors breathing space to resume their lives after the trial is over. *See United States v. DiMasi*, 795 F.Supp.2d 115 (D. Mass. 2011) (postponing disclosure for one day, after conclusion of seven-week trial); *contrast Doherty*, 675 F.Supp. at 720-721 (delaying release of juror list for seven days after 62-day trial and eight-day deliberation while jurors sequestered at hotel); *U.S. v. Butt*, 753 F. Supp. 44 (D. Mass. 1990) (delaying release for

8

seven days after trial that included sensitive testimony and an emotional reading of the verdict, and recording particularized reasons for delay in impounded portion of opinion).

## CONCLUSION

For the foregoing reasons, Intervenor Trustees of Boston University, through its radio station WBUR, respectfully requests that its motion be granted, and that it be provided with access to the names and addresses of the jurors soon as possible after the verdict is rendered.

Respectfully Submitted,

TRUSTEES OF BOSTON UNIVERSITY,

By its attorney,

/s/ Jeffrey J. Pyle

Jeffrey J. Pyle (BBO #647438)
PRINCE LOBEL TYE LLP
One International Place, Suite 3700
Boston, MA 02110
(617) 456-8000
(617) 456-8100 (fax)
jpyle@princelobel.com

## CERTIFICATE OF SERVICE

I, Jeffrey J. Pyle, hereby certify that this document was delivered to AUSA B. Stephanie Siegmann and counsel for David Wright, Jessica Hedges, by first-class mail and electronic mail on October 13, 2017.

/s/ Jeffrey J. Pyle

Jeffrey J. Pyle

2801652.v1